## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GRETA SEMSROTH, et al.,       )
                        )
              **Plaintiffs,**     )
                        )        **CIVIL ACTION**
**v.**                        )
                        )        **No. 06-2376-KHV**
CITY OF WICHITA,          )
                        )
              **Defendant.**    )
_____)

### MEMORANDUM AND ORDER

Greta Semsroth, Kim Warehime and Sara Voyles bring suit against the City of Wichita, Kansas alleging retaliation on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.[1] This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #84) filed January 11, 2008. For reasons stated below, the Court sustains the motion.

### Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

---

[1] On December 27, 2007, the Court dismissed the claims of Heather Plush as a sanction for her failure to comply with discovery procedures. See Memorandum And Order (Doc. #78).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the nonmoving parties must demonstrate that genuine issues remain for trial "as to those dispositive matters for which [they] carr[y] the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving parties may not rest on their pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the parties opposing the motion for summary judgment. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving parties' evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51.  In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the nonmoving party:

The City of Wichita, Kansas (the "City") is a municipality formed under the laws of the State of Kansas.  Plaintiffs are females, and at all times relevant to this action, were commissioned police officers in the Wichita Police Department (the "Department").  On July 28, 2004, plaintiffs filed suit

against the City alleging (in part) discrimination on basis of sex in violation of Title VII.  See Semsroth v. City of Wichita, No. 04-1245-MLB (D. Kan.) ("Semsroth I").  Plaintiffs' claims in this case arise out of retaliation which allegedly occurred after they filed Semsroth I.[2]

## I.   Plaintiff Semsroth

In July of 2005, Semsroth requested a break from her normal duties as a patrol officer.  At the time of this request, Semsroth was highly stressed and emotional; she had been seeing a counselor for post-traumatic stress disorder related to a robbery suspect who had shot himself in her presence.  Semsroth's request to work as the "badge on the floor" was granted.[3]

On July 9, 2005, Sergeant James Pinegar contacted Lieutenant John Bannister to report that Semsroth was working as the badge on the floor at her request.   Pinegar told Bannister that

---

[2]      Although Heather Plush is no longer a plaintiff in this action, plaintiffs submit an excerpt of her deposition testimony which highlights alleged acts of retaliation against her. Specifically, she testified as follows:

> Q.    Okay.  You also said that you thought you were investigated in retaliation for complaining of discrimination to Captain Tabor.  When did that occur?
>
> A.    The first investigation occurred – I got served on August 30th.
>
> Q.    And are there more than one?
>
> A.    Yes.
>
> Q.    How many are there?
>
> A.    Three.

Deposition Of Heather Plush, attached as Exhibit 8 to Plaintiffs' Response To Defendant's Motion For Summary Judgment ("Plaintiffs' Response") (Doc. #91) filed March 10, 2008.

[3]      "Badge on the floor" refers to an officer who is assigned to work the front desk of a substation.  The badge on the floor answers telephone calls, makes police reports and handles walk-ins.  The record does not reveal who granted Semsroth's request to work as the badge on the floor.

Semsroth's "head was not in the game" and that she did not want to ride patrol or respond to 911 calls.

On July 10, 2005, Bannister contacted Captain Michael Allred and they decided that because Semsroth had no performance problems, she would not be required to see a Department psychologist.[4]  They agreed, however, that the psychologists would be available to Semsroth at her discretion, free of charge.  After speaking with Allred, Bannister met with Semsroth to discuss her well being.  Bannister advised Semsroth that Department psychologists were available to counsel her if she chose.  Bannister explained to Semsroth that she was not required to visit any doctor and that if she did, her visit would be kept confidential.  Semsroth asked Bannister to arrange an appointment with Dr. Bowman.[5]

On July 11, 2005 Allred spoke with Semsroth and informed her that she would be allowed to work as the badge on the floor until she felt comfortable returning to patrol duty.  Allred informed Semsroth of the City's employee assistance program and reminded her that department psychologists were available to help.  Semsroth indicated to Allred that she might see Dr. Bowman.  Allred confirmed that her visit with Dr. Bowman would be confidential because the Department had not ordered her to seek counseling.  Semsroth indicated that she understood this confidentiality.  Later that day, Allred spoke with Bannister and learned that Semsroth had asked Bannister to make her an appointment with Dr. Bowman.  Allred told Bannister to let Dr. Bowman know that the appointment was not mandatory and that the City did not want any feedback concerning the appointment.  The

[4]       An officer may be required to undergo a fitness for duty test when he or she performs deficiently.  With regard to Semsroth, officers within the department had no discussion whether she should be given a fitness for duty examination.

[5]       The record does not reveal Dr. Bowman's first name.

same day, Bannister made the appointment with Dr. Bowman.  Bannister told Dr. Bowman that the appointment was not mandatory and that he was assisting Semsroth in scheduling her appointment because she had been suffering from post-traumatic stress disorder.

On July 12, 2005, Semsroth voluntarily met with Dr. Bowman.  During the meeting, Dr. Bowman told Semsroth that he had learned from Bannister that she was involved in a lawsuit against the City.  Dr. Bowman also told Semsroth that Bannister had requested that he examine her fitness for duty.  After meeting with Semsroth, Dr. Bowman called Bannister and informed him that Semsroth was having severe emotional problems and was not fit for duty.  Dr. Bowman suggested that Semsroth might take a leave of absence.  Bannister reported Dr. Bowman's opinion to Allred, who told Bannister that Semsroth's work assignment would not be changed because of Dr. Bowman's opinion.

On July 14, 2005, Bannister received a letter from Dr. Bowman confirming his opinion that Semsroth was not fit for duty.  Bannister gave this letter to Allred.  Shortly thereafter, Semsroth met with Bannister and expressed her concern that her meeting with Dr. Bowman would have a negative impact on her service record.  Bannister assured her that the meeting was confidential and would have no affect on her record.  Semsroth then told Bannister that she wanted to return to patrol duty and would handle future counseling on her own.  She indicated that she would not be requesting leave because she had not accumulated enough paid leave and could not afford to take unpaid leave.

On July 14, 2005, Allred received a letter from Dr. Bowman which indicated that Semsroth was not fit for duty.  He did not make any change in Semroth's assigned duties, however, as a result of this letter.  Within a few days after July 14, 2005, Bannister told Allred that Semsroth wanted to return to patrol duty.  Allred told Bannister that Semsroth could do so.  On July 18, 2005, Bannister

received a second letter from Dr. Bowman which indicated that Semsroth was not fit for duty in a traffic assignment.  That same day, Semsroth was given a traffic assignment and returned to patrol duty.  The City did not take action against Semsroth as a result of her visits with Dr. Bowman or the letters which Dr. Bowman sent to Bannister and Allred.  Her annual performance evaluations, performance file and personnel file contain no reference to the fitness for duty examination or any of Dr. Bowman's letters.

Semsroth alleges that the City retaliated against her for filing Semsroth I by requiring her to submit to the fitness for duty examination when she had no record of deficient performance.

**II.      Plaintiff Warehime**

On August 14, 2004, Warehime transferred to Mayberry Middle School to become a school resource officer.  On June 6, 2005, Captain John Speer advertised an opening for a school resource officer at Hamilton Middle School.  On June 10, 2005, Warehime applied for that position.

Under department policy, "[i]t is recommended that all members serve one (1) year in a new assignment before applying for another transfer/rotation."  Historically, an officer is not permitted to transfer from a speciality assignment before serving at least one year in that position.  Because Warehime had been the school resource officer at Mayberry for only ten months when she applied for the Hamilton position, Speer told Deputy Chief Tom Stolz that she should not be considered for the job.  Stolz determined that the Hamilton position could be filled at the beginning of the school year (i.e., August) and that Warehime should not be disqualified.[6]  Some time before June 21, 2005, Captain Terry Nelson and Sergeant Jerry Quick told Warehime that she would receive the Hamilton

---

[6]      Generally, school resource officer positions are filled in August to coincide with the beginning of the school year.

position.

In a written complaint dated June 21, 2005, Warehime claimed that Detective Bob Gulliver had begun a community policing project which was almost identical to a project which she had tried to initiate. Her complaint stated that "[t]his is second time this week I have read in the paper that a male officer has proceeded with projects that I have suggested and have been turned down or put off." The complaint further stated that "[t]his is an example of discrimination by the Wichita Police Department to female officers who approach supervisors with ideas and projects which are not respected." Warehime gave the complaint to Quick. She intended for her complaint to highlight the fact that the department stopped women from developing projects. She filed the complaint to promote cooperation between herself and Gulliver. She did not believe that Gulliver knew of her project or that he had taken credit for it.

The City received Warehime's complaint on June 29, 2005. The next day, Nelson called Warehime into his office and told her that she would not be transferred to the Hamilton position. Warehime contacted the fraternal order of police to grieve that decision. On August 13, 2005, the Department transferred Warehime to the Hamilton school resource officer position. This transfer coincided with the beginning of the school year and occurred at the same time as all other school resource officer transfers. The transfer also marked Warehime's one year anniversary of service at Mayberry.

Warehime alleges that the City retaliated against her for filing the discrimination complaint on June 21, 2005, by revoking her transfer approval and returning it to her only after she contacted the fraternal order of police.

III.    **Plaintiff Voyles**

In late June of 2005, Voyles contacted Lieutenant Jeffrey Easter to inquire whether his gang unit had an opening for a light duty assignment, which she desired because she was pregnant.  In response, Easter said that he had a light duty assignment which would become available in early July and that if she was allowed to, she could come to his unit and work juvenile cases.  Easter was not Voyles' supervisor, and she understood that he could not promise her an assignment in his gang unit.[7]

After speaking with Easter, Voyles met with Allred – her supervisor – to discuss her pregnancy and the need for a light duty assignment.  Voyles told Allred that she had talked to Easter and that he would have an opening in his gang unit in early July.  Allred told Voyles that if he could find her a light duty position in the field, she would be used in that capacity and would not be transferred to the gang unit.  Allred explained that he would prefer to assign Voyles to a badge on the floor position, which would free up a non-light duty officer to patrol the streets.[8]  Allred also indicated that he did not want to transfer Voyles to Easter's gang unit on the sixth floor because in Semsroth I she had complained of another officer on the sixth floor – Lieutenant James Bohannon.[9]  Although Bohannon worked in the robbery unit, Allred expressed concern with Voyles working anywhere on the sixth floor.

---

[7]    Officers are not allowed to pick their own light duty assignments.  Under normal procedure, an officer's request for light duty assignment is considered by his or her captain or direct supervisor.  Voyles' decision to directly contact another supervising officer was atypical.  In fact, Easter had never received such an inquiry from an officer.

[8]    Because officers on light duty can accomplish badge on the floor duties, the Department commonly designates such officers as badges on the floor.  This practice saves the department from restricting otherwise full duty officers to desk responsibilities.

[9]    Voyles' complaint against Bohannon concerned comments he had made about her during a previous pregnancy.

Because Allred's patrol did not have a light duty opening, he emailed other captains regarding available light duty positions. Speer responded that he had a badge on the floor opening in his patrol, and the Department assigned Voyles to light duty work as the badge on the floor in that patrol. Voyles worked as the badge on the floor until late August or early September of 2005, when she accepted a community policing position in the same patrol.[10]  Voyles continued on light duty until January of 2006. Her light duty assignments did not affect her pay or the hours she worked.

Voyles alleges that the City retaliated against her for filing Semsroth I by denying her the opportunity to transfer into the gang unit.

### Analysis

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden under a mixed-motive theory or a pretext theory. See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008). The mixed-motive theory requires plaintiff to "directly show that retaliatory animus played a 'motivating part' in the employment decision."  Id. at 1225 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989)). Where plaintiff is unable to directly establish that retaliation played a motivating part in an employment decision, she may rely on the three-part framework of McDonnell Douglas Corp. v.

---

[10]     Voyles had previously requested a community policing position. Although the record is not clear, this position is apparently also a light duty assignment.

<u>Green</u>, 411 U.S. 792 (1973), "to prove that the employer's proffered reason for its decision is a pretext for retaliation." <u>Id.</u> (citing <u>Medlock v. Ortho Biotech, Inc.</u>, 164 F.3d 545, 549-50 (10th Cir. 1999)). Semsroth and Warehime utilize the <u>McDonnell Douglas</u> framework, while Voyles relies on a mixed-motive theory. The Court considers each claim separately.

**I.      Plaintiff Semsroth**

As noted above, Semsroth alleges that in retaliation for filing <u>Semsroth I</u>, the City required her to submit to a fitness for duty examination when she had no record of deficient performance. Under the burden-shifting framework of <u>McDonnell Douglas</u>, a plaintiff must first establish a prima facie case of discrimination. 411 U.S. at 802. If she does so, the burden shifts to the employer to articulate a legitimate and facially nondiscriminatory reason for its action. <u>Id.</u> From there, the burden returns to plaintiff to show that the employer's reason is pretextual. <u>Id.</u> at 804.

To establish a prima facie case of retaliation, Semsroth must show that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the material adverse action.  <u>See</u> <u>Argo v. Blue Cross & Blue Shield of Kan.</u>, 452 F.3d 1193, 1202 (10th Cir. 2006). The City argues that is entitled to summary judgment because Semsroth cannot establish the second and third elements of her prima facie case.

A.      <u>Adverse Action</u>

The City argues that Semsroth has not suffered materially adverse action because she understood that her appointment with Dr. Bowman was voluntary. Title VII protects individuals from retaliation that produces an injury or harm. <u>Burlington N. & Santa Fe Ry. v. White</u>, 126 S. Ct. 2405, 2414 (2006). For purposes of a Title VII retaliation claim, a materially adverse action is one

which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415.  In determining material adversity, "the significance of any given act of retaliation will often depend upon the particular circumstances." Id.; see also Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1090 (10th Cir. 2007) (to warrant trial, plaintiff must show that jury could conclude that reasonable person in her shoes well might have been dissuaded from making charge of discrimination).

Semsroth argues that she suffered materially adverse action because no employee would want to be subjected to an unnecessary fitness for duty examination.  She does not cite any authority, however, for the proposition that the examination which Dr. Bowman administered might dissuade a reasonable person from filing a discrimination charge.  Generally, courts have rejected the argument that a fitness for duty examination, by itself, constitutes materially adverse action.  See Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 786-87 (7th Cir. 2007) (plaintiff placed on administrative leave without impact to position, salary or benefits did not suffer materially adverse action by undergoing fitness for duty examination); Croswell v. Triborough Bridge & Tunnel Auth., No. 03 Civ. 2990, 2007 WL 2274252, at *13 (S.D.N.Y. Aug. 7, 2007) (rejecting fitness for duty examination as materially adverse action which might create causal connection to protected activity); Cotton v. AT&T Operations, Inc., No. 4:06-CV-438, 2007 WL 2259318, at *9 (E.D. Mo. Aug. 2, 2007) (plaintiff who receives full pay during absence and is reinstated following fitness for duty examination did not suffer materially adverse action).

Here, the record contains evidence that before Semsroth visited Dr. Bowman, two of her supervisors told her that any appointment was voluntary and confidential.  Semsroth admits that she understood this.  The record also contains evidence the Dr. Bowman was aware of the voluntary

nature of the appointment.  These facts clearly establish that Semsroth met with Dr. Bowman at her own discretion.  During the appointment, Semsroth apparently learned that her lieutenant had instructed Dr. Bowman to administer a fitness for duty examination, but the record contains no evidence that the appointment was ever mandatory or that Semsroth was formally required to submit to a fitness for duty examination.

Two days after the examination, Semsroth's lieutenant reaffirmed the confidential nature of the appointment.  When Semsroth asked to return to patrol duty, her captain accommodated the request.  The uncontroverted evidence demonstrates that the Department took no action toward Semsroth as a result of her visit with Dr. Bowman or any fitness for duty examination which he administered.  The fact that the examination never became a part of Semsroth's performance evaluations and personnel file reflects the confidential nature of the examination.  Under these circumstances, no reasonable jury would find that the administration of a fitness for duty examination in the context of a voluntary appointment would dissuade a reasonable person from making a discrimination complaint, particularly because the City took no action as a result of the examination.

B.    Causal Connection

The City further argues that Semsroth has not established a causal connection between the filing of Semsroth I and the fitness for duty examination.  To establish a sufficient causal connection, plaintiff must show that defendant was motivated to commit the challenged conduct by a desire to retaliate against her protected activity.  See Hinds v. Sprint/United Mgmt. Co., --- F.3d ----, 2008 WL 1795059, at *11 (10th Cir. Apr. 22, 2008).  Because the filing of Semsroth I in July of 2004 and the fitness for duty examination in July of 2005 do not share a close temporal proximity, see id. at *12, Semsroth argues that a sufficient causal connection is established with evidence that the City engaged

in a pattern of discrimination.  In this regard, the Tenth Circuit has recognized that "a pattern of adverse personnel actions over a period of weeks or months may demonstrate an employer's retaliatory animus notwithstanding the absence of close temporal proximity between the employee's initial protected activity and the employer's ultimate [adverse action]."  Steele v. Kroenke Sports Enters., L.L.C., No. 06-1377, 2008 WL 360614, at *8 (10th Cir. Feb. 11, 2008) (citing Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996)); see also Hinds, 2008 WL 1795059, at *12 (pattern of retaliatory conduct may provide temporal proximity sufficient to preclude summary judgment).

As evidence of a pattern of discrimination, Semsroth identifies (1) three disciplinary actions filed against Plush, and (2) the revocation of Warehime's school resource officer position at Hamilton middle school.[11]  Semsroth does not suggest that the City engaged in a pattern of discrimination *against her*.  Even assuming that evidence of discrimination against Plush and Warehime may establish causation with respect to Semsroth, see Sprint/United Mgmt. v. Mendelsohn, 128 S. Ct. 1140, 1147 (2008) (evidence of discrimination by other supervisors may be relevant in individual

---

[11]     As additional evidence of a pattern of retaliation, Semsroth claims that a supervisor said that he wished "the bitches would just die."  This statement is not supported in her statement of uncontroverted facts, and the record does not indicate when the supervisor made the statement. Semsroth also claims that she was banished to Beat 39 in December of 2003 because she complained of discrimination.  This action pre-dates the filing of Semsroth I.  Moreover, the Honorable Monti L. Belot has previously determined as a matter of law that the City had a legitimate nondiscriminatory reason for the transfer.  See Semsroth v. City of Wichita, No. 04-1245-MLB, 2007 WL 1246223, at *31-32 (D. Kan. Apr. 27, 2007).  These acts do not help to establish a pattern of retaliation which suggests a casual connection between the filing of Semsroth I and Semsroth's fitness for duty examination.
    Although the record contains evidence that Bannister told Dr. Bowman that Semsroth was a plaintiff in the prior lawsuit, Semsroth does not argue that this evidence somehow establishes a sufficient casual connection between the filing of Semsroth I and her fitness for duty examination. She has presented no evidence which suggests that Bannister told Dr. Bowman to perform the fitness for duty examination because she was a plaintiff in Semsroth I.

case depending on many factors), these particular acts are insufficient to establish the necessary pattern of retaliation stemming from the filing of <u>Semsroth I</u>. In fact, Plush and Warehime expressly attribute these alleged acts of retaliation to protected activity other than the filing of <u>Semsroth I</u>. Specifically, Plush claims that the City investigated her in retaliation for complaints of discrimination to Captain Tabor and Warehime claims that the City revoked the Hamilton position because she complained to Quick that she did not receive credit for her project ideas.

Further, even if the alleged retaliatory acts could be attributed to the filing of <u>Semsroth I</u>, the record does not support the argument that they fill the gap in time between the filing of <u>Semsroth I</u> (in July of 2004) and Semsroth's fitness for duty examination (in July of 2005). The record does not reveal when the investigations against Plush occurred. The City's revocation of Warehime's position in June of 2005 – eleven months after the filing of <u>Semsroth I</u> – lacks sufficient temporal proximity to support the alleged pattern of retaliation. <u>See</u> <u>Hinds</u>, 2008 WL 1795059, at *11 (acts beginning pattern of retaliation must share close temporal proximity with protected activity). Even viewed in the light most favorable to Semsroth, this evidence does not support the causation element of her prima facie case.

On this record, the Court finds that Semsroth has not presented evidence sufficient to establish the adverse action and causation elements of her prima facie retaliation case. She has therefore failed to meet her initial burden under the <u>McDonnell Douglas</u> framework and the City is entitled to summary judgment on her claim.

## II.    Plaintiff Warehime

As noted above, Warehime alleges that because she filed a discrimination complaint on June 21, 2005, the City revoked her transfer to Hamilton middle school. Warehime's retaliation

claim is analyzed under the McDonnell Douglas burden-shifting framework, described above.  The City argues in part that Warehime cannot establish a prima facie case of retaliation because she did not suffer materially adverse action.

A materially adverse action is one which may dissuade a reasonable person from making a discrimination complaint.  See Burlington N., 126 S. Ct. at 2415.  Warehime argues that she suffered materially adverse action when the police department revoked her transfer from Mayberry middle school to Hamilton middle school.  In this regard, the Tenth Circuit has stated that the denial of a transfer does not constitute materially adverse action where plaintiff "identifie[s] no specific rationale for the transfer other than an undefined subjective preference for the change."  McGowan v. City Eufala, 472 F.3d 736, 743 (10th Cir. 2006).  Here, the record contains no evidence that the Hamilton position offered Warehime better pay, benefits or hours than the Mayberry position.  The fact that both positions were school resource officer positions suggests that Warehime would have performed virtually identical work at either school.  Also, the transfer was not permanently denied.  At most, Warehime temporarily lost the opportunity to transfer to a position which she subjectively preferred.  Under these circumstances, the Court finds no genuine issue of material fact whether Warehime suffered materially adverse action when the department revoked her transfer to Hamilton middle school.  See id. (no materially adverse action where transfer offered no difference in pay or benefits, was not less arduous and was not permanently denied); see also Carrero v. Robinson, No. 05cv-02414-MSK-CBS, 2007 WL 1655350, at *14 (D. Colo. June 5, 2007) (to show denied transfer materially adverse, plaintiff must show that requested assignment offered substantially different benefits or conditions or employment, not merely that she subjectively desired different assignment).

Because the record evidence is insufficient as a matter of law to establish that Warehime

suffered materially adverse action, she has not met her initial burden under <u>McDonnell Douglas</u> and the City is entitled to summary judgment on her claim.

## III.     Plaintiff Voyles

As noted above, Voyles alleges that because she filed <u>Semsroth I</u>, the City denied her the opportunity to transfer into the gang unit.  Voyles argues her retaliation claim under a mixed-motive framework.[12]  Under the mixed-motive theory, plaintiff must directly show that retaliatory animus played a motivating part in the employment decision.  <u>Fye</u>, 516 F.3d at 1225.  If she can do so, the burden of persuasion shifts to the employer to prove that it would have taken the same action absent the retaliatory motive.  <u>Id.</u>

For purposes of a mixed-motive analysis, direct evidence of discrimination includes evidence of "oral or written statements on the part of a defendant showing a discriminatory motivation." <u>Cuenca v. Univ. of Kan.</u>, 101 Fed. Appx. 782, 788 (10th Cir. 2004) (quoting <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1225 (10th Cir. 2000)).  Voyles argues that Allred's stated reason for refusing the transfer (<u>i.e.</u> it would put her near an officer of whom she had complained about in <u>Semsroth I</u>) constitutes direct evidence of retaliation.  The City does not dispute this argument, and for purposes of the motion, the Court assumes that it does.

---

[12]     Citing <u>Fox v. Wichita State University</u>, 489 F. Supp.2d 1216 (D. Kan. 2007), the City argues that Voyles cannot proceed under a mixed-motive theory because she did not assert such a claim in the pretrial order.  In <u>Fox</u>, the court found that on summary judgment, a plaintiff cannot argue a mixed-motive claim which has not been set out in the pretrial order.  <u>Id.</u> at 1227.  More recently, however, the Tenth Circuit has explained that "a plaintiff need not characterize her case as a mixed-motive or pretext case from the outset." <u>Fye</u>, 516 F.3d at 1225 (application of mixed-motive or pretext theory left to plaintiff's persuasion of factfinder).  At least one court of this district has used the language in <u>Fye</u> to reject the argument that a mixed-motive theory must be preserved in the pretrial order.  <u>See</u> <u>Wright v. C & M Tire, Inc.</u>, --- F. Supp.2d ----, 2008 WL 1701688, at *7 n.6 (D. Kan. Apr. 11, 2008).  The Court agrees that a mixed-motive theory of retaliation need not be expressly set out in the pretrial order, and will allow Voyles to argue her claim accordingly.

Assuming that Voyles has produced direct evidence of discrimination, the City argues that it is nonetheless entitled to summary judgment because Voyles did not suffer adverse action. Regardless whether plaintiff asserts her retaliation claim under a mixed-motive or pretext theory, adverse action is a fundamental component of the claim.  Wright, 2008 WL 1701688, at *7 (citing Gudenkauf v. Stauffer Commc'ns, Inc., 158 F.3d 1074, 1078 (10th Cir. 1998) (in mixed motive case, plaintiff required to establish adverse employment action)).  Indeed, without distinguishing between mixed-motive and pretext theories of retaliation, Burlington Northern speaks generally of Title VII's anti-retaliation provision as protecting employees "not from all retaliation, but from retaliation that produces an injury or harm."  126 S. Ct. at 2414.

Voyles argues that she suffered adverse action because Allred denied her request to transfer to the gang unit.  As discussed above, the denial of a transfer constitutes a materially adverse action only if the employee presents some evidence beyond her subjective desire for the position. McGowan, 472 F.3d at 743.  Here, Voyles' brief in opposition to the motion for summary judgment reflects nothing more than a purely subjective preference for the gang unit.  See Plaintiffs' Response (Doc. #91) at 14.  ("no reasonable employee would complain about a supervisor harassing them or make any other complaint if it will affect their position of choice").  As with Warehime, the record contains no evidence that the gang unit was objectively preferable – in terms of pay, benefits or work load – to the light duty assignments which Voyles received.[13]  In fact, Voyles eventually received a community policing position in which she had previously expressed interest.

On this record, the Court finds no evidence that Voyles suffered materially adverse action

---

[13]     Here, Voyles received a light duty assignment which she required given her pregnancy, but complains that it was not the one she wanted.

when Allred denied her request to transfer to the gang unit.  Although Allred may have denied the transfer because Voyles had complained of a particular officer in <u>Semsroth I</u>, the fact that she suffered no materially adverse action is fatal to her claim.  The Court therefore finds that the City is entitled to summary judgment.

      **IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #84) filed January 11, 2008 be and hereby is **SUSTAINED**.  The Clerk of the Court is directed to enter judgment in favor of defendant in this matter.

      Dated this 28th day of April, 2008 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge